```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
 2                         COLUMBIA DIVISION

 3      UNITED STATES OF AMERICA,    )    CR. NO. 3:25-CR-54
                                     )    COLUMBIA, SC
 4                                   )    JANUARY 30, 2025
                                     )
 5           VERSUS                  )
                                     )
 6      MOHAMMAD EBRAHIM TORKI        )
        HARCHEGANI,                  )
 7                                   )
                        DEFENDANT.    )
 8      _____)

 9            BEFORE THE HONORABLE PAIGE J. GOSSETT
              UNITED STATES MAGISTRATE COURT JUDGE
10                      DETENTION HEARING

11      APPEARANCES:

12      FOR THE GOVERNMENT:     ELLE ELIZABETH KLEIN, AUSA
                                UNITED STATES ATTORNEY'S OFFICE
13                              1441 MAIN STREET
                                SUITE 500
14                              COLUMBIA, SC 29201

15      FOR THE DEFENDANT:      SUHA NAJJAR, AFPD
                                FEDERAL PUBLIC DEFENDER'S
16                                OFFICE
                                1901 ASSEMBLY STREET
17                              SUITE 200
                                COLUMBIA, SC 29201

18
        COURT REPORTER:         DEBRA R. BULL, RPR, CRR
19                              UNITED STATES COURT REPORTER
                                315 SOUTH MCDUFFIE STREET
20                              ANDERSON, SC  29624

21

22            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                     *** *** *** *** ***
23

24

25
```

```
 1                        INDEX
 2  JACQUELYN HAMELRYCK
 3       Direct exam by Ms. Klein                4
 4       Cross exam by Ms. Najjar               18
 5                      EXHIBITS
 6                      GOVERNMENT
 7  1 Conversations from chat room               7
 8                       DEFENSE
 9
10  1 Character letters                         25
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    (Whereupon, the hearing commenced at 2:56 p.m.)

2         THE COURT:   All right.   Ms. Klein, I believe

3    you have the next case.

4         MS. KLEIN:   Yes, Judge, may it please the Court.

5    The next matter is United States versus Mohammed Ebrahim

6    Torki Harchegani, criminal docket number 3:25-54.   We

7    are here on a detention hearing on this matter.

8         THE COURT:   And the Government is prepared to

9    proceed at this time?

10         MS. KLEIN:   We are, Your Honor.

11         THE COURT:   All right.   And, Ms. Najjar, you

12    are representing, I believe, is the surname actually

13    Torki?

14         MS. NAJJAR:   Yes, ma'am.

15         THE COURT:   Rather than Harchegani, which I was

16    referring to him at his initial appearance, so it is

17    Torki?

18         MS. NAJJAR:   Yes, Your Honor.

19         THE COURT:   Are you prepared to go forward with a

20    hearing on the Government's motion at this time?

21         MS. NAJJAR:   Yes, ma'am.

22         THE COURT:   All right.   Ms. Klein, you may call

23    your first witness or begin your proffer.

24         MS. KLEIN:   Your Honor, the Government calls

25    Special Agent Jackie Hamelryck.

4

Direct exam of Jacquelyn Hamelryck

1          THE COURT:  Special Agent Hamelryck,  if you

2      would please come forward and raise your right hand to

3      be sworn.

4           JACQUELYN HAMELRYCK, having been first duly

5      sworn, testified as follows:

6                        DIRECT EXAM

7  BY MS. KLEIN:

8  Q.      Special Agent Hamelryck,  please describe for the

9      Court your law enforcement background.

10  A.      I have worked for the FBI for 26 years, and I was

11      in local law enforcement prior to that for approximately

12      five years.

13  Q.      And what kinds of cases, now, as an FBI agent,  do

14      you generally investigate?

15  A.      Violent crimes against children, which includes

16      sexual exploitation of minors and human trafficking.

17  Q.      And have you received extensive training and

18      experience regarding these child sexual exploitation

19      cases?

20  A.      Yes, ma'am.

21  Q.      Are you the case agent investigating the federal

22      case against the Defendant here?

23  A.      Yes.

24  Q.      Let's talk about the facts of this case as it goes

25      to the weight of the evidence.  What was the date of

Direct exam of Jacquelyn Hamelryck

1    conduct that gives rise to this indictment?

2    A.    December 3rd through the 5th, 2024.

3    Q.    And describe for the Court what brought law

4    enforcement into contact with Mr. Torki.

5    A.    So, there was a South Carolina internet crimes

6    against children task force undercover chat operation

7    that different federal, state, and local authorities

8    were involved in beginning December 3rd and ending on

9    the 5th in 2024.   The goal of that operation was to

10   identify adults on different social media platforms who

11   had an interest in having sex with children and

12   travelling to followup  -- follow through with that

13   interest in having sex with minors.

14   Q.    And during the time of this operation, did the

15   Defendant make contact with the undercover?

16   A.    Yes.   So, Mr. Torki ended up contacting and in

17   conversation with one of the undercover designated chat

18   investigators, Mr. Smith.   He was portraying himself

19   as a 14-year-old female, Mr. Torki's user name or name

20   he was going by or alias at that time was Alex Shaw.

21   They met on a dating App called Badoo, B-a-d-o-o, it is

22   kind of a free-dating App where you can meet other

23   people.

24          They had a brief contact there and exchanged

25   phone numbers.   He mentioned he worked for the

Direct exam of Jacquelyn Hamelryck

1    University.  And then they continued the conversation

2    the following day through Textnow, a free application

3    from -- between two different phone numbers.

4  Q.     How the did the Defendant first indicate that he

5    was interested in having sex with this alleged

6    14-year-old?

7  A.     He mentioned in the text conversation that he was

8    horny, and that he had very good skills in the bedroom,

9    and he could show her or demonstrate those when they

10    were private together.

11         MS. KLEIN:  Your Honor,  may I approach the

12    witness?

13         THE COURT:   You may.

14                  DIRECT EXAM CONTINUED

15  BY MS. KLEIN:

16  Q.     Agent, do you recognize the exhibit that has been

17    marked as Government's exhibit 1?

18  A.     I do.

19  Q.     What are those?

20  A.     These are copies of the -- part of the chat

21    conversations between the undercover and Mr. Torki.

22  Q.     You say those are just "part" of the

23    conversations,  not all of them; is that correct?

24  A.     That is correct.

25         MS. KLEIN:  Your Honor,  at this time, we would

Direct exam of Jacquelyn Hamelryck

1     move to make that Government's exhibit 1.

2            MS. NAJJAR:  No objections.

3            THE COURT:  All right.  Government's exhibit 1

4     is in evidence without objection.

5                    DIRECT EXAM CONTINUED

6  BY MS. KLEIN:

7   Q.      Special Agent Hamelryck,  would you please read,

8     for the Court,  the text messages that make it clear

9     what Mr. Torki's intent was during the exchange of these

10    messages?

11  A.      So,  in the chat conversation in front of me,  one

12    of the comments he makes to who he believes is a

13    14-year-old minor is:

14            "Well I have many skills in the

15            bedroom that I am sure you will

16            love.  We can talk about them in

17            person,  though.  Do you feel

18            comfortable enough to have some

19            privacy together?"

20            He then goes on to describe exactly what he would

21    like to do with her,  describes it as this:

22            "Okay.  So we are going to start by

23            having a long kiss and whispering

24            love in your ears.  Then going down

25            little by little rubbing some baby

Direct exam of Jacquelyn Hamelryck

1          oil on your chest and gently sucking
2          on your" -- he spells out nipples
3          with some periods in between -- "and
4          going further down and licking your
5          belly button.  Then laying you down
6          and getting down in your genitals"
7          -- and genitals is also spelled with
8          different periods in between it
9          spelled out -- "and licking it so
10         well from top to bottom with a lot
11         of baby oil and gently touching your
12         G spot" --  "spot" has periods in
13         between it spelled out --
14         "stimulating it so well until you
15         start shaking to a climax,  dot dot
16         dot."
17         Then the main story begins with an emoji.
18    Q.   This is after the undercover had expressed they
19    were 14 years old; is that right?
20    A.   Yes.   The undercover had mentioned their age of
21    14 several times and Mr. Torki had responded in such a
22    way that he acknowledged that she was a minor because he
23    said some individuals that would make them uncomfortable
24    because of the legality of it.
25    Q.   Then did the Defendant eventually arrange to meet

Direct exam of Jacquelyn Hamelryck

1    with the believed 14-year-old?

2  A.      He did.

3  Q.      And then did he, in fact, travel to the house

4    where he thought the undercover was?

5  A.      He did.   He drove his vehicle that was registered

6    in his name to a designated address that was given to

7    him by the undercover.   He drove up to the house,

8    walked up to the front door with a backpack and a bag of

9    McDonald's in his hands, and then went around to the

10   side of the house, and walked in to the side door

11   underneath the carport, and he was arrested by Richland

12   County Sheriff's Department when he walked in.

13 Q.      At the time he arrived at the residence,  did he

14   believe that the 14-year-old was at home alone?

15 A.      Yes.   During the chats he asked about the parents

16   and he believed that the mom was at work so that the

17   14-year-old was going to be home alone.

18 Q.      And you mentioneded he brought McDonald's; is that

19   correct?

20 A.      That's correct.

21 Q.      How does that demonstrate his intent or how is

22   that relevant in this case?

23 A.      Prior to coming to the residence,  the undercover

24   asked him to stop by a specific McDonald's on Garners

25   Ferry Road in Columbia to pick up a preorder that the

Direct exam of Jacquelyn Hamelryck

1    undercover had already made at the McDonald's.    He

2    ended up driving to McDonald's,  law enforcement

3    observed him in his vehicle,  he parked in the parking

4    space,  waited for the employee to bring that specific

5    order that the undercover had already paid for.    Once

6    the order was delivered to his vehicle,  he was seen

7    leaving the McDonald's, and then went from the

8    McDonald's to the residence that the undercover had

9    provided as the residence where the 14-year-old was

10   supposed to be home alone.

11  Q.      Now,  that night when he was arrested,  were any

12   of the items that were on the Defendant seized that

13   evening?

14  A.      There was a phone and a laptop that was seized.

15  Q.      Were search warrants later obtained?

16  A.      Yes,  there were state search warrants,  the

17   internet crimes against children forensic investigator

18   obtained a search warrant for those items.

19  Q.      And has a preliminary review of those items begun?

20  A.      Preliminary review has begun on the phone.

21  Q.      Was there any information that raised concerns for

22   you, as an experienced investigator, in child

23   exploitation?

24  A.      There are other conversations that we don't know

25   who the other person is on the other end, they were

Direct exam of Jacquelyn Hamelryck

1    sexually explicit trying to talk about meeting up  with
2    individuals and having sex and different sex acts.   And
3    there is also an App on the phone that is created by a
4    burner phone, so it basically, I think, advertises as
5    you can get a new number at the click of a button so it
6    can create or generate a new number for someone if they
7    want it.
8    Q.     Was there also SnapChat and Kik Apps observed on
9    this phone?
10   A.     Yes.  There were several what appeared to be
11   different accounts that he has,  one on Kik and one on
12   Snap where he also used that, and those are also in
13   different names.  The name that he used in the
14   undercover was Alex Shaw, these had different names,
15   one was George with some numbers,  it was spelled
16   G-e-o-r-g-e, and then the other account was J-o-r-g-e,
17   with a series of numbers,  I believe.
18   Q.     And in your experience in investigating child
19   exploitation, are these Snapchat and Kik Apps also
20   frequently used by offenders to reach and communicate
21   with minors?
22   A.     Yes.  And it is not unusual that they have
23   multiple accounts in different names to do so.
24   Q.     Now,  I want to circle back to the messages that
25   were sent by the Defendant to the undercover in this

12

Direct exam of Jacquelyn Hamelryck

1   case.   What evidence do you have that it was Mr. Torki

2   who was behind the messages that were sent expressing

3   intent to have sex with the minor?

4   A.      Well,  this conversation was located in the phone

5   in the preview.  I was able to locate this particular

6   conversation that we were referring to with the

7   undercover.   We were  -- I also observed during the

8   conversation there were photographs exchanged between

9   the undercover and Mr. Torki.   Mr. Torki provided, I

10  think, two or three photographs of himself,  several of

11  them looked like he was in a business setting and one

12  was in his vehicle.

13  Q.      In these messages, did he ever make specific

14  references to his job?

15  A.      He did.   He was a University professor or worked

16  for the University.

17  Q.      And I believe you already said he arrived with the

18  food that the undercover said she had ordered in her

19  name?

20  A.      Yes.  He had the McDonald's order that had been

21  preordered by the undercover in his possession when he

22  arrived at the call.   Then, after his arrest, he

23  contacted via email the investigator for Richland County

24  Sheriff's Department asking for his devices back.

25  Q.      And in that email to Richland County,  did he

Direct exam of Jacquelyn Hamelryck

1    attempt to explain away his conduct on the night that he

2    was arrested?

3    A.      He did.   He mentioned he was trapped by someone

4    who was pretending to be a minor that he had taken some

5    food to.

6    Q.      Searching the Defendant's history because that is

7    relevant to purposes of detention,  is Mr. Torki a

8    citizen of the United States?

9    A.      No.

10   Q.      Where is he a citizen?

11   A.      Iran.

12   Q.      What is his legal status here in the United

13   States?

14   A.      He is a legal permanent residence.

15   Q.      Are you aware of any significant ties outside of

16   the United States,  outside of the citizenship?

17   A.      Yes,  I believe he has family back in Iran.

18   Q.      How about significant ties to our community here,

19   our district here?

20   A.      The only tie I know of to the community here was

21   his job at the University of South Carolina.

22   Q.      What is the status of his job with the University

23   at this time?

24   A.      When he was arrested in December,  the University

25   of South Carolina put him on notice that he was

14

Direct exam of Jacquelyn Hamelryck

1    suspended, and I have since been told by the University

2    that he has  -- his contract has not been renewed as of

3    December 31,  2024.

4   Q.     So, you do not believe he is employed at this

5    time?

6   A.     Correct.  He is not employed as far as I know.

7   Q.     Do you know whether or not the Defendant is

8    married?

9   A.     He is.

10   Q.     Do you know whether or not his wife is employed

11    here in the United States?

12   A.     I don't know of any employment,  but I do know

13    that she is also,  I believe,  from Iran.

14   Q.     Do you know if they own any real property near the

15    district?

16   A.     Not that I am aware of.  Their residence is a

17    rental apartment.

18   Q.     Now,  you mentioned that his employment at the

19    University was suspended and his contract was ultimately

20    not renewed.  Were there additional communications that

21    you received from the University that pertained to this

22    case?

23   A.     Yes.  There was a communication from the Dean to

24    Mr. Torki that notified him of his suspension, and in

25    response to that, there is an e-mail from Mr. Torki who

Direct exam of Jacquelyn Hamelryck

1    advised that the arrest was basically a mistake based on

2    a wrong search warrant that was served at his residence

3    for the previous tenant.   He actually attached a copy

4    of a Lexington County Sheriff's Department search

5    warrant.   I contacted that investigator, who was on the

6    warrant, and confirmed that it was related to a prior

7    tenant,  but it had nothing to do with his arrest in

8    December.

9  Q.      Do you recall what the time frame of that search

10    warrant was?

11  A.      I believe it was in August of 2024.

12  Q.      And just to make sure that it is clear,  in August

13    of 2024,  there was a different individual living or

14    previously living in the apartment that Mr. Torki was

15    currently living in now; is that correct?

16  A.      Right.   So, the search warrant is marked

17    unserved, but they did leave a copy at the apartment so

18    that is how Mr. Torki, I believe, must have had it in

19    his possession to be able to send it to the Dean as a

20    reason for his arrest in December.

21  Q.      And relayed to the Dean that this was all a

22    miscommunication and a mistake?

23  A.      Totally unrelated to his arrest in December.

24  Q.      What day was the Defendant federally arrested?

25  A.      January 24th,  2025.

16

Direct exam of Jacquelyn Hamelryck

1  Q.      And after he was arrested, was he transported

2      eventually to the Marshals for booking as is customary

3      with a new arrest?

4  A.      Yes.

5  Q.      Without getting into the specifics of his medical

6      history, was the Defendant fully truthful with the

7      Marshals about his health status at booking?

8  A.      No.

9  Q.      Explain to the Court how he was untruthful.

10 A.      It is standard procedure for the marshal service

11     to ask standard health related type questions for their

12     own care and also obviously preparing for any housing at

13     local facilities.   When he was asked about different

14     health issues, his reply was always no, and that

15     included when they got, when they repeated if he had any

16     infectious diseases.

17 Q.      And do you have independent information confirming

18     the Defendant's current health status as it relates to

19     infectious disease?

20 A.      I do.

21 Q.      Again, I am not trying to embarrass the

22     defendant, but I do think it is relevant to

23     dangerousness.   At the time that he travelled to have

24     sex with who he believed to be a minor, had the

25     Defendant -- did the Defendant have an infectious

Direct exam of Jacquelyn Hamelryck

1     disease that was transmitted sexually?

2   A.     Yes.

3   Q.     Did he disclose that to the minor?

4   A.     No.

5   Q.     Are you aware of any evidence that gives you

6     concerns about the Defendant's risk of flight?

7   A.     Yes.   He has asked on his bond on the state side

8     to travel back to Iran.

9   Q.     Do you recall when that was filed?

10  A.     January 15th, 2025.

11  Q.     And as a condition of his state bond that he not

12    leave the state; is that correct?

13  A.     That's correct.

14  Q.     And did you look into the Defendant's travel

15    history to see if he had regularly been coming back and

16    forth between Iran prior to his state arrest?

17  A.     I did and it looked like at least maybe once a

18    year in the last five to six years annually he was going

19    back to Iran.

20  Q.     And you have handled, as I said, a number of cases

21    addressing child exploitation; is that right?

22  A.     Yes.

23  Q.     Do you have concerns about the safety of the

24    community if this Defendant were to be issued a bond?

25  A.     I do.

Cross exam of Jacquelyn Hamelryck

1   Q.      What are those?

2   A.      We have individuals who create aliases, their

3       entire meeting online, talking to minors, it is

4       secret, it is not something they are going to share

5       with others. And so my concern is is that you have an

6       individual who is willing to go to someone's house, he

7       had never been before, did not know, believing that a

8       14-year-old was there alone, that he was going to be

9       able to have sex with. And it is very concerning,

10      obviously, because hands-on offenders or potential

11      hands-on offenders, it is very rare that they are only

12      meeting one person online; typically, in my cases, I

13      have seen multiple victims or individuals are trying to

14      meet up with.

15          MS. KLEIN:  No further questions from the

16      Government.

17          THE COURT:  Cross-examination, Ms. Najjar.

18          MS. NAJJAR:  Yes, Your Honor, just briefly.

19                      CROSS EXAM

20  BY MS. NAJJAR:

21  Q.      Agent Hamelryck, the App that you mentioned, what

22      is it called, Badoo?

23  A.      Yes, ma'am.

24  Q.      Is that a dating App?

25  A.      It is a dating App.

19

Cross exam of Jacquelyn Hamelryck

1  Q.      Is it similar to like Bumble?

2  A.      I don't know.   I am not familiar with a lot of

3      the dating Apps,  I know Badoo is just a free dating App

4      that anyone can build a profile on and meet other

5      people.

6  Q.      Okay.   And you have to be 18 years old to join

7      that,  correct?

8  A.      I think that is one of the requirements; it

9      usually is on the dating Apps.

10  Q.      At the time he joined the dating App and you

11      allege he connected with this undercover agent,  the

12      profile he would have believed that the person was older

13      than 18 years old,  correct?

14  A.      I don't know what the profile said, I do know that

15      during the conversation he was told that she was 14.

16  Q.      Okay.   So,  at the time that he joined the App

17      -- the App you just swipe it left or right; is that

18      correct?

19  A.      I think so.

20  Q.      There is no chat rooms,  here?

21  A.      When they met,  they exchanged phone numbers;

22      during that conversation, he was told several times

23      about her age and he responded.

24  Q.      That is not my question,  I am asking you about

25      the App itself.   The App itself.   When you use it, you

Cross exam of Jacquelyn Hamelryck

1    have to swipe left or right whether you are interested

2    in the person, correct?

3  A.       I think so.  I have never been on the App, never

4    swiped left or right on Badoo, I have never been on it.

5  Q.       Okay.  And the person -- the child or this agent

6    did not disclose that they were 14 years old until after

7    they started texting; is that correct?

8  A.       I think it was initially.  Those conversations

9    were not recorded because the undercover got kicked off

10   Badoo, so they are not recorded like these are.  This

11   text conversation is recorded, screen recorded by the

12   undercover.  And during this conversation, the 14 --

13   the age of the undercover was mentioned.

14 Q.       Okay.

15 A.       And so he recognized that the undercover was a

16   minor based on his responses, as well, that she was

17   14.

18 Q.       So, the agents did not keep any record of the

19   conversations that were actually on the App?

20 A.       It doesn't say, and then they were kicked off of

21   the particular site, so when it moved to a text

22   conversation, they screen-shotted the entire

23   conversation, which this Government's exhibit is a part

24   of.

25 Q.       They could have screen-shotted the conversations

Cross exam of Jacquelyn Hamelryck

```
1        that were on the App, yes?
2   A.       I don't know. I am not the undercover, so that
3        would be a question for that investigator.
4   Q.       Okay.  And why were they kicked off the App?
5   A.       I don't know what the rules of the administrators
6        of Badoo are, I don't work for that company, so I
7        don't know at what point they kick people off or leave
8        people using it.
9   Q.       And then you stated that -- did you make any
10       effort, after the fact, to get any of those
11       conversations from Badoo?
12  A.       Yes.  They didn't maintain them.
13  Q.       So, you subpoenaed Badoo?
14  A.       We contacted the company and they said they did
15       not maintain or did not have records of that.
16  Q.       Did you get a warrants?
17  A.       I did not get a search warrant.
18  Q.       Did you get a subpoena?
19  A.       I did ask for a subpoena, they said that they did
20       not have records for that conversation.
21  Q.       You are not answering my question. Did you get a
22       subpoena from the Court?
23  A.       No, I did not.
24  Q.       All right.  You also stated that his laptops were
25       searched, right?
```

Cross exam of Jacquelyn Hamelryck

1  A.       It was not searched, it was seized, but it has
2      not been processed.
3  Q.       The laptop hasn't been processed yet?
4  A.       No, ma'am.
5  Q.       But the cellphone is processed?
6  A.       It has been processed, but the full report has not
7      been provided to me.
8  Q.       You said you were a bit concerned because it had
9      SnapChat and the Kik App?
10 A.       No, that is not my concern.
11 Q.       Well, didn't the Government ask you whether you
12     were concerned because he had SnapChat and Kik?
13 A.       My concern is he is using different aliases to
14     create accounts, specifically to hide meeting and
15     interacting with my sex partners, which included this
16     undercover 14-year-old.
17 Q.       But it is not illegal to have SnapChat?
18 A.       No, ma'am.
19 Q.       It is not illegal to make aliases?
20 A.       No, ma'am.
21 Q.       That is what the agents were doing?
22 A.       I'm sorry?
23 Q.       That is what the agents did, the undercover
24     agent?
25 A.       Yes.

Cross exam of Jacquelyn Hamelryck

1   Q.      And, obviously, you had to run a criminal history

2       check on Mr. Torki,  right?

3   A.      Yes.

4   Q.      And did you find any criminal record at all for

5       Mr. Torki?

6   A.      No.   The only criminal arrest I found was the one

7       in December.

8   Q.      Okay.   And you also mentioned this scenario where

9       he had a search warrant that he showed to his

10      supervisor; is that correct?

11  A.      He attached it to an e-mail to the Dean, which I

12      think is going to be his direct report.

13  Q.      But you do know that he resided at that address

14      when the officers served the warrant, he did not just

15      find it there?

16  A.      Right.   The warrant was not for him, it was for

17      the previous tenant.

18  Q.      I wanted to clarify,  it is not like he found some

19      warrant,  he actually was in the residence at the time

20      that they tried to execute the warrant,  yes?

21  A.      I don't know if he was in there or not; I know

22      they did leave the warrant unserved and left a copy

23      there.

24  Q.      Okay.   And you asked about his significant tie

25      -- whether he had ties to the community,  you are not

Coloquy

```
1    aware of his ties to the community,  current?
2  A.      No.   The only tie to the community that I am
3    aware of is the University.
4         MS. NAJJAR:  Beg the Court's  indulgence. No
5    further questions,  Your Honor.
6         THE COURT:  Before you redirect,  Ms. Klein,  let
7    me just make sure I don't have any questions for this
8    witness based on my notes.
9         MS. KLEIN:  No redirect,  Your Honor.
10         THE COURT:   Thank you.
11           Special Agent Hamelryck,  you may step down.
12         THE WITNESS:  Thank you.
13         THE COURT:   Ms. Klein,  did you have any other
14    evidence you wanted to present or proffer on behalf of
15    the Government?
16         MS. KLEIN:  No Your Honor.
17         THE COURT:   Ms. Najjar,  did you have any
18    evidence you wanted to present or proffer on behalf of
19    the Defendant?
20         MS. NAJJAR:  Your Honor,  I do have character
21    letters here.
22         THE COURT:   Okay.
23         MS. NAJJAR:  I have provided Ms. Klein and I
24    believe without objection.
25         MS. KLEIN:  No objection,  Judge.
```

Coloquy

1    MS. NAJJAR:  I can proffer or I can do it in
2    argument just to save time for the Court.
3    THE COURT:   You had additional information to
4    proffer other than these character letters?
5    MS. NAJJAR:  Yes,  Your Honor.
6    THE COURT:   Go ahead and tell me the evidence or
7    components of that.
8    MS. NAJJAR:  Yes,  Your Honor.   So,  I have
9    spoken to Mr. Torki's attorney,  Mr. Snell, who informed
10   me that he has actually hired a clinical psychologist
11   and a forensic psychologist Dr. Selman Watson, I have
12   spoken to Mr. Watson (sic).   He is conducting an
13   evaluation of Dr. Torki (sic) and has completed two
14   sessions so far and he needs about two more sessions
15   with him.   I asked him whether he had any concerns
16   about Mr. Torki and dangerousness to the community and
17   he said,  quote,  no concerns whatsoever,  I don't think
18   he is a threat to anyone.
19        He also told me he is not exhibiting any
20   vegetative signs of depression.   He told me that he
21   regularly checks on his clients and that the last time
22   he checked on Mr. Torki, he determined that he was doing
23   okay.   He  -- and that is when he told me also he had
24   no vegetative signs of depression.
25        In addition to that, I provided the character

26

Coloquy

 1    letters to the Court.   I also have the passports of

 2    Mr. Torki, along with his wife, is also going to turn

 3    that into the Court.   Other than that, Your Honor, I

 4    save the rest for arguments.

 5         THE COURT:   Okay.   Thank you.   All right.

 6    Now, I have reviewed Defendant's exhibit 1, which was

 7    placed into evidence without objection.   At this time,

 8    I will hear argument from the Government.

 9         MS. KLEIN:   Thank you, Judge.   This is a

10    rebuttable presumption case, the Defendant, as far as

11    the offense involving a minor in a 2242, and I do

12    believe that presumption has been rebutted despite these

13    character letters and reference to the psychologist who

14    has deemed Mr. Torki not a danger, but it is unclear to

15    me what exactly that psychologist has reviewed, whether

16    he knows the full facts of this case or the full depth

17    of the involvement the Defendant had with the

18    undercover.

19         Regardless of the rebuttable presumption, I do

20    think the factors strongly support detention in this

21    case beginning with the weight of the evidence.   The

22    Defendant solicited sex from someone he thought was 14

23    years old.   Once he thought they were 14 years old, he

24    sent a series of text messages saying, I am bored and

25    horny, I have skills in the bedroom, and those things

1       that he wants to do to this individual sexually.

2              He then shows up to the child's residence where

3       he thought that she was home alone to have sex with her.

4       And this Defendant has an infectious disease that is

5       transmitted sexually, and was possibly exposing a child

6       to a lifelong illness, and that he has been dishonest

7       about this condition even when confronted by the

8       Marshals.

9              Further,  this didn't occur over one day,  these

10      messages span several days.  So, this is not just one

11      impulsive action, but it is premeditated and calculated

12      when he repeatedly sent these messages and ultimately

13      decided to then travel to the location where the child

14      was.

15             He has also demonstrated a willingness to go

16      hands-on with children.  You see a lot of he is in

17      possessions or distribution cases come through this

18      courthouse,  but the Defendant is taking it one step

19      further and achieving the highest behavior where he is

20      travelling to have sex with someone who he thinks is a

21      minor.

22             Additional factors include that he was subject

23      to a lengthy period of incarceration.  This charge

24      carries a mandatory minimum of ten years, and I

25      recognize he received a state bond,  but what he was

1  charged with on the state side does not carry a

2  mandatory minimum, so he is looking at a much more

3  substantial time now.

4  He lacks stable employment.  He was suspended

5  as a result of this conduct.  And to add insult to

6  injury, he lied to his employer when he tried to say

7  that this prior search warrant for the tenant prior in

8  the apartment he now resided was really who they were

9  after and that is simply not the case, they were after

10  him because he travelled to have sex with the minor.

11  He lacks significant ties to this community.  I

12  didn't hear any contrary evidence.  While he is

13  married, his wife is unemployed here, she is not a

14  U.S. citizen, they do not have children, they do not

15  own their home, they rent.  And he has significant

16  ties outside the United States and they see removal or

17  deportation after serving a period of incarceration in

18  this case.

19  He has also demonstrated an attempt to evade law

20  enforcement.  He is using aliases in his communications

21  to disguise himself.  He used Alex Shaw in one, and as

22  the agent testified, they found two additional

23  applications where he was using different aliases to

24  have communication with folks.  He is sending emails

25  trying to explain away his conduct or deny his intent

 1     when arriving to the minor's home,  again,  who was home

 2     alone, and who he was communicating with with clear

 3     intent to have sex with.   And more concerning, he is

 4     filing motions for bond seeking permission to leave the

 5     country when he knows he is facing charges here in the

 6     United States.

 7              The nature of these particular offenses show the

 8     Defendant is a danger to the community.   He has

 9     additional health concerns that make his conduct here

10     even more troubling, and he has shown he is dishonest to

11     his employer, to the Marshals, and I don't believe that

12     he can be honest with the Court in saying he could abide

13     with any conditions that the Court would set and I ask

14     that he be detained.

15              THE COURT:   Thank you.

16          Ms. Najjar.

17          MS. NAJJAR:  Thank you,  Your Honor.   Your Honor,

18     I would like to start with the history and

19     characteristics of Mr. Torki.   As reflected in his

20     character letters, as well as in the Pretrial Services

21     Report, he has been in the United States for 11 years;

22     he was worked as a professor.   He contributes to his

23     community and his family and he has no history of

24     criminal conduct prior to this charge.   And,  again,

25     this is just a charge under 18 USC 3142(j),  nothing in

1    this session should be construed as modified or limiting

2    the presumption of innocence.   A lot of the

3    Government's arguments with regard to deportation if he

4    is convicted has to do with whether he is convicted and

5    those are not relevant for purposes of determining bond.

6          Your Honor,  furthermore,  he is  -- his medical

7    condition that the Government believes is a reason for

8    him to be detained is actually a reason for him to be

9    released.   He is not receiving his medication at

10   Barnwell.   He has a heightened risk of ammonia because

11   of this and his cell count increases without his meds.

12   Prior to this incident,  he was regularly visiting his

13   doctor every three months or every two to three weeks,

14   I'm sorry, and he needs to continue those visits with

15   his doctor,  as well.

16          As to family ties and community ties,  although

17   he has not been in South Carolina,  he has been in the

18   United States for 11 years,  has always visited his

19   homeland and returned,  as well.   And the Government is

20   pointing to the fact that he filed a motion in state

21   court for a bond modification to allow him to go to

22   Iran, so that tells you that he is following the Court's

23   orders in requesting these modifications.   I do not

24   believe if he was thinking of leaving or running away he

25   would have just left,  he would not have notified the

1    Court and the authorities that he is, you know,

2    wanting to go to, you know.  Nevertheless, he did

3    provide both his passport and his wife's passport to the

4    Court to ensure that he has no intention of leaving.

5    And if he ever had any intention of leaving the state

6    even, he would request that from the Court.

7         Your Honor, he was employed, and although he is

8    not employed now, he is actively seeking employment.

9    His wife is employed. She actually works because prior

10   to this they were living in Florida, she has a remote

11   job, she has an annual income, and her job is very

12   secure, and she can support him until he is able to

13   secure another job . However, because of these charges,

14   because of the payment to the state attorney -- the

15   defense attorney on the state side, there is a lot of

16   debt and he needs to assist his wife and find a job to

17   help him get through this time, as well.

18        Your Honor, he has no criminal record, no

19   history relating to drug or alcohol abuse at all, and no

20   record of non appearance.  He has been on bond.  The

21   conditions of his bond in state court were that he just

22   not leave the State of South Carolina, but otherwise

23   had no low case monitoring or curfews, but he still

24   abided by the Court's orders in the state court.  I

25   think that is all I have.

Coloquy

1          Okay.   The final thing I will state is he is

2     not a risk of flight and the probation conditions --

3     probation is recommending release here; however, there

4     are a few conditions which Mr. Torki would disagree

5     with:  The first one is he get medical or psychiatric

6     treatment as directed by Pretrial Services; he is

7     already getting that treatment.   He should not be

8     required to take any medications without the Government

9     meeting its burden to prove that they can compel any

10    sort of treatment and that Probation and the Government

11    should not have any access to any medical records, for

12    that reason he would oppose that condition.

13          He should not be required to participate in any

14    inpatient or outpatient substance abuse therapy,  there

15    is no indication that he has any history of that or that

16    he takes any prohibited substances.

17          An issue with electronic monitoring,  home

18    incarceration is a bit severe here too,  as well.  He

19    would ask that he be subject to location monitoring in

20    addition to the conditions that he has in state court so

21    that he can maintain employment and assist his wife at

22    home as well.

23          Your Honor,  he would also ask for an unsecured

24    bonds in this case.   He  -- like I said,  has many

25    goings because the Court  -- if the Court imposes

Coloquy

1    conditions, such as location monitoring or even a curfew

2    in this case, that should be sufficient to ensure his

3    appearance at court and that he -- as the doctor

4    stated, and as he has been on bond since December, he

5    is not a danger to the community, and so he would ask

6    for an unsecured bond.

7        THE COURT: All right. Anything further from

8    the Government?

9        MS. KLEIN: Judge, just know that when probation

10   made their recommendation as for secured bond, they

11   weren't aware of the facts of this case, the conduct

12   the Defendant engaged in. And if the Court is so

13   inclined to issue a bond for this Defendant, in addition

14   to the recommendation -- recommended conditions, we

15   would also ask that the Defendant have no contact with

16   minor children, all electronic devices should be

17   disclosed to United States Probation, can be allowed to

18   install software to monitor that activity. This is a

19   standard condition we have seen in other cases,

20   actually for possessors only, but here we have hands on.

21   And then we also ask that he not use, own, view, or

22   read any material depicting or describing sexually

23   explicit conduct involving an identifiable minor.

24        Again, we still strongly feel detention is

25   necessary, but if this Court is inclined to give a

Coloquy

1     bond, we ask that those conditions also be imposed.

2          THE COURT:  All right.  Based on everything I

3     have heard today, the information in the Pretrial

4     Services Report and argument of counsel, I have

5     concluded that I need to take this matter under

6     advisement.  I want to study some of the conditions

7     that the Court has attempted to use in the past in cases

8     of this type and ponder whether those would address the

9     danger that has been relied on here by the Government,

10    so I will issue an order on the Government's motion as

11    soon as possible.

12          MS. KLEIN:  Thank you, Your Honor.

13       (Whereupon, the hearing concluded at 3:35 p.m.)

14                     CERTIFICATE

15

16

17       I certify that the foregoing is a correct transcript

18    from the official electronic sound recording tape number

19    196 of the proceedings in the above-entitled matter.

20

21

22    _____          February 18, 2025

23              S/Debra R. Bull                   Date

24

25