**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CR. NO. 3:25-CR-054-MGL** |
| | ) | |
| **v.** | ) | **MOTION TO RECONSIDER DETENTION** |
| | ) | **ORDER AND/OR REQUEST TO REOPEN** |
| **MOHAMMAD EBRAHIM TORKI** | ) | **DETENTION HEARING** |
| **HARCHEGANI,** | ) | |
| | ) | |
| _____**DEFENDANT.**_____ | ) | |

NOW COMES the defendant, MOHAMMAD EBRAHIM TORKI HARCHEGANI, by and through his appointed counsel, who respectfully requests this Court reconsider its prior ruling and/or reopen the detention hearing pursuant to 18 U.S.C. § 3142(f). The motion is made on the grounds that newly obtained information not known to Dr. Harchegani at the time of the hearing has a material bearing on the issue of whether there are conditions of release that will reasonably assure his appearance as required and the safety of any other person and the community.

**FACTS AND PROCEDURAL BACKGROUND**

On January 21, 2025, the government charged Dr. Harchegani with one count of attempted enticement of a minor in violation of 18 U.S.C. §§ 2253 and 2248 and 28 U.S.C. §2462(c). ECF No. 3. On January 24, 2025, Dr. Harchegani made his initial appearance before the Magistrate Judge. ECF No. 11. At that time, the government moved for detention and a hearing was conducted on January 30, 2025. ECF No. 27.

At the detention hearing, the government alleged the following:

Dr. Harchegani is a legal permanent resident from Iran. Det. Hr'g. Tr. 13:06-14. Prior to his state and federal charges, he was employed as a professor at the University of South Carolina. _Id_. at 13:18-14:03. In early December, Dr. Harchegani used a messaging software to

1

communicate with an undercover agent ("UC") purporting to be a minor. *Id*. at 5:14-23. He sent explicit messages to and arranged to meet with the UC at the house where he believed the UC resided. *Id*. at 6:07-19; 8:25-9:05. However, the only images he sent to the UC were images of himself in a business setting or in his vehicle—he did not send any sexually explicit images of himself or otherwise. *Id*. at 12:04-12. When Dr. Harchegani arrived at the house with food the UC directed him to pick up, he was arrested. *Id*. at 9:23-10:14. The only additional items found in Dr. Harchegani's possession were a phone and laptop. *Id*. A forensic review of the phone showed that Dr. Harchegani engaged in sexually explicit conversations with other persons using different messaging apps. *Id*. at 10:21-11:23. However, there is no indication that those individuals were minors. *Id*. ██████████████████████████

██████████████████ *Id*. at 16:01-17:04. Finally, Dr. Harchegani abided by the terms of his state bond by notifying and requesting permission from the court to travel to Iran to visit his family as he has done annually for the last five to six years. *Id*. at 17:05-19.

Dr. Harchegani presented the following evidence:

Dr. Harchegani has resided in the United States for the past 11 years. *Id*. at 29:17-25.  He has never been charged or convicted of a crime—not even a speeding ticket. *Id*. Nor does he have any history of substance abuse. *Id*. at 32:13-16. He is a professor who has made significant contributions to advancing scientific knowledge. *See* ECF No. 27, Def. Ex. 1. Specifically, his research focused on cancer cell migration and embryonic development. *Id*. In fact, he obtained legal residence status through the National Interest Waiver Program. *Id*. A person is eligible for this employment-based immigration visa if they "are a member of the professions holding an advanced degree or its equivalent, or a person who has exceptional ability." *Employment-Based Immigration: Second Preference EB-2*, USCIS, https://www.uscis.gov/working-in-the-united-

states/permanent-workers/employment-based-immigration-second-preference-eb-2 (last accessed Mar. 20, 2025). "Exceptional ability" is defined as "a degree of expertise significantly above that ordinarily encountered in the sciences, arts, or business." *Id*. Beyond his professional achievements, his professional peers assert that he is an asset to any community and a "driving force for positive change." ECF No. 27, Def. Ex. 1. He has contributed to the community by preparing and delivering food aid to underserved families. *Id*. He once assisted a student who could not afford her tuition by helping her secure a loan. She ultimately successfully completed her master's program in 2022. *Id*. His wife, Nafiseh Faghihi, also wields a Ph.D. and works for a non-profit organization that provides access to care for underserved women fighting breast and cervical cancer. *Id*. She maintains a steady income sufficient to support Dr. Harchegani while on release. Det. Hr'g. Tr. 31:07-17.

Dr. Selman Watson, forensic psychologist, had been conducting an evaluation of Dr. Harchegani before his arrest. *Id*. at 25:08-24. He concluded that he had "no concerns whatsoever" and he "didn't think he is a threat to anyone." *Id*. Dr. Watson conducted regular checks with Dr. Harchegani and did not believe that he exhibited any vegetative signs of depression. *Id*. ███████████████████████████████████████████ ███████████████████████ *Id*. at 30:06-15. He has regular visits with his doctor every two to three weeks that are necessary for his health and well-being. *Id*. Dr. Harchegani also provided the court with his passport and his wife's passport. *Id*. at 26:01-04. His prior behavior—namely abiding by all conditions of his state bond and requesting permission from the court before travelling—indicates that he will fully comply with any bond conditions. *Id*. at 30:16-31:06.

After hearing from the parties, the Court concluded that it needed to take the matter under advisement to "study some of the conditions that the Court has attempted to use in the past in

cases of this type and ponder whether those would address the danger that has been relied on here by the Government." *Id*. at 34:02-11.

On January 21, 2025, the Court issued its order of detention pending trial. ECF No. 29. The court determined that there is a rebuttable presumption under 18 U.S.C. § 3142(e)(3) but did not determine whether the presumption had been rebutted. *Id*. The court determined that no condition or combination of conditions of release would reasonably assure Dr. Harchegani's appearance or the safety of the community. *Id*. It identified the reasons for detention as the following: 1) the weight of the evidence against Dr. Harchegani is strong; 2) he is subject to a 10 year minimum penalty if convicted; 3) he has significant family ties outside of the United States; and 4) he may be subject to removal or deportation if convicted. *Id*. The court further explained:

> Evidence that approximately six weeks ago Defendant responded to an undercover agent posing as a 14 year old and travelled to what he believed to be her house to have sex with her while she was home alone. Evidence showing that Defendant is inclined to engage in hands-on sexual contact with minors. Computer monitoring conditions would not reasonably assure the safety of minors in the community.

*Id*.

The Court did not explain why computer monitoring conditions or any other combination of conditions would not reasonably assure the safety of the community.

Since his arrest on January 24, 2025, Dr. Harchegani has been incarcerated at the Barnwell County Detention Center ("Barnwell"). His mental and medical condition has rapidly and significantly deteriorated. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████ █████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████ It has deteriorated to such a degree that

it has been difficult for Dr. Harchegani to discuss his case, review discovery, or otherwise assist

counsel in his defense.

Furthermore, in accordance with Dr. Harchegani's religion, he must follow a halal diet.

And on February 28, 2025, the Islamic holy month of Ramadan began. It is a time of increased

charity, worship and a strict fast for practicing Muslims like Dr. Harchegani. He observes a strict

fast from dawn until sunset where he is not allowed to eat or drink water during daylight hours.

Barnwell's meals—usually beans in the evening and peanut butter before sunrise— have not

provided Dr. Harchegani with the necessary nutritional supplements required during this month.

Coupled with his medical and mental condition, the fast has taken a heavy toll on Dr.

Harchegani. The Eid-ul-fitr feast, one of two Muslim holidays, is also approaching. It lasts three

days and is commemorated by a large community-wide prayer in the morning followed by

traditional meals and charity. Dr. Harchegani will not be able to participate in any of this—

████████████████████████████████████████████████ nor his wife and

community.

Dr. Harchegani now moves the Court to reconsider its order of detention. Alternatively,

he moves the Court to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f) which states

that "[t]he hearing may be reopened, before or after a determination by the judicial officer, at any

time before trial if the judicial officer finds that information exists that was not known to the

---

[1] ████████████████████████████████████████████
████████████████████████████████

movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

## THE FEDERAL BAIL CRISIS

"The Bail Reform Act of 1984 ("BRA") allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure ... the safety of any other person and the community.'" *United States v. Salerno*, 481 U.S. 739, 741 (1987). Factors the court should consider when imposing conditions of release include the nature and circumstances of the offense, the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings. 18 U.S.C. §3142(g).

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 741. "The BRA prioritizes pretrial release, placing the burden on the government to establish that a person who is presumed innocent should be locked in jail pending trial rather than released into the community." Alison Siegler et al., *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis*, 20 (2022) [hereinafter "*Freedom Denied*"]. Thus, there is a presumption of release for most arrestees. 18 U.S.C. §§ 3142(b)–(c);  *see also United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) ("Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant."); *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention."); *United*

*States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) (deeming pretrial detention "an exceptional step"); *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (finding the Bail Reform Act of 1984 "codified . . . the traditional presumption favoring pretrial release 'for the majority of Federal defendants'" (*quoting* S. Rep. No. 98-225, at 6–7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189))); *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985) ("[T]he statutory scheme of 18 U.S.C. § 3142 continues to favor release over pretrial detention."). "The BRA's preference for pretrial release is further evinced in § 3142(j), which mandates: 'Nothing in this section shall be construed as modifying or limiting the presumption of innocence.'" *Freedom Denied*, at 20 (*quoting* 18 U.S.C. § 3142(j)).

Despite *Salerno*'s mandate, "pretrial detention is now the norm, not the exception." *Freedom Denied*, at 20. According to a rigorous analysis of federal pretrial detention practices, federal pretrial detention rates have skyrocketed since the BRA was enacted. *Id*. The report reveals a "fractured and freewheeling federal pretrial detention system that has strayed far from the norm of pretrial liberty." *Id*. at 16. ("Based on our empirical courtwatching data and interviews with nearly 50 stakeholders, we conclude that a 'culture of detention' pervades the federal courts, with habit and courtroom custom overriding the written law."). The latest statistics from the Administrative Office of U.S. Courts show that in the year 2024, 71.7% of defendants in new cases were detained. *Table H-14, U.S. District Courts – Pretrial Services Release and Detention For the 12-Month Period Ending Sept. 30, 2024.*[2] This is true despite data that proves that pretrial detention is not necessary to promote the goals of the BRA—preventing flight or crime. *Table H-15, U.S. District Courts – Pretrial Services Violations Summary Report*

---

[2] Available at https://www.uscourts.gov/sites/default/files/2025-01/jb_h14_0930.2024.pdf.

*For the 12-Month Period Ending Sept. 30, 2024*.[3] In fact, out of the 606 cases in release status in the District of South Carolina, there were only 10 rearrests violations. *Id*. Rates of nonappearance and rearrest are just as low in the federal courts with the highest pretrial release rates at they are in those with the lowest release dates, which proves that judges could release far more people without risking safety or nonappearance. *Id*. at 25.

While there is no evidence to support the notion that pretrial detention improves court appearance rates or safety to the community, there is a wealth of evidence that links pretrial detention to negative consequences for detainees. *See Pretrial Detention*, Prison Policy Initiative, (curated list of "virtually all the research about pretrial detention available online").[4] These negative consequences include increased likelihood of conviction, recidivism, and harsher sentences. *Id*. Moreover, pretrial detention adversely impacts employment, residential stability, and children of detainees. *Id*. The "federal bail crisis" reflects a "a troubling divergence between the written bail law and on-the-ground practices across the country, as well as racial disparities in pretrial detention practices." *Freedom Denied*, at 17. "To rectify the situation, judges must adhere more closely to the laws governing the pretrial process and take decisive steps to shift the culture from one that prioritizes detention to one that prioritizes release." *Id*.

The report further demonstrated that the detention rate for defendants facing a presumption of detention is nearly 20 percentage points higher than that for defendants not facing a presumption, even though today "there is no evidence that people in presumption cases pose any greater risk than those in non- presumption cases." *Id*. at 158. The AO study confirms

---

[3] Available at https://www.uscourts.gov/sites/default/files/2025-01/jb_h15_0930.2024.pdf.

[4] Available at https://www.prisonpolicy.org/research/pretrial_detention/.

that the presumption increases the detention rate without advancing community safety. Rather than jailing the worst of the worst, the presumption overincarcerates the lowest-risk offenders in the system, people who are stable, employed, educated, and have minimal to no criminal history. *Id*. at 57. When a low-risk individual is not facing a presumption, they're released 94% of the time. *Id*. Yet an identically low-risk individual in a presumption case is released just 68% of the time. *Id*. This Court can certainly take these developments into account when evaluating the presumption of detention in this case.

Pretrial jailing imposes tremendous human suffering: roughly 166,000 human beings are currently locked in federal jails, spending an average of one year in jail. AO Table H-15 (Sept. 30, 2024) (117,978); AO Table H-9A (Sept. 30, 2024) (353 days). While in jail, people suffer major personal losses—their job, home, custody of their children. *Freedom Denied*, at 62 (citing studies). These harms also impact the loved ones and communities of those detained. *Id*. "The brutal reality is that people detained pretrial in federal jails are deprived of necessary medical care, live in dangerously overcrowded conditions, [and] are subjected to violence." *Id*. at 63. Moreover, the high federal detention rates fall overwhelmingly on people of color and those from low-income backgrounds. *ld.* at 24. The first few days of detention can also be dangerous. Despite the trauma and danger inherent in the first few days of a jail stay, jails' physical and mental health screenings and treatment offerings are often inadequate. *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail lnmates*, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails) [hereinafter "Maruschak"].

Data proves that pretrial detention does not make our communities safer or ensure appearance in court: "The harmful effects of pretrial detention cannot be justified as

permissible consequences of protecting the community, since research shows that pretrial detention-for any amount of time-is correlated with an *increase* in recidivism." *Freedom Denied*, at 62 & n.102. The AO cites a famous study that found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition." Austin, *supra* note 12, at 54. More recent studies have confirmed that pretrial detention is criminogenic[5] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[6] One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate. *See* Maruschak, at 9. In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables. James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release. In other words,

---

[5] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Legal Stud. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[6] Emily Leslie & Nolan G. Pope, *The Unintended lmpact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & Econ. 529, 555 (2017).

pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place. Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment lnstrument: A Research Summar*y, 82(2) FED. PROB. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T. Conversely, releasing more people prior to trial does not correlate with increased rates of failure to appear or rearrest for new crimes. *Freedom Denied*, at 24. In fact, the rates at which people on federal pretrial release either fail to appear in court or are rearrested for a new crime are extraordinarily low, "with both sitting at approximately 1-2%." *Id*. "Strikingly, rates of nonappearance and rearrest are just as low in the federal courts with the *highest* pretrial release rates as they are in the districts with the *lowest* release rates." *Id*. at 25 fig. 4.

There are also enormous fiscal costs associated with high federal pretrial detention rates. In 2021, it cost more than $35,000 to put a single person in jail for a year. *Id*. at 23. The report estimated that taxpayers spend "more than *one billion dollars* per year to pay for federal pretrial jailing." *Id*. (emphasis added).

## LEGAL STANDARDS

"[C]ase law emphasizes two checks that the BRA and the Constitution impose on the presumption: (1) [At Step 1,] there is an easy-to-meet standard for rebutting the presumption and the prosecution always bears the burden of persuasion, and (2) [at Step 2,] the presumption alone does not warrant detention and must always be weighed along with other factors [in 3142(g)]." *Freedom Denied*, at 151; *see also Bail*, 51 GEO. L.J. ANN. REV. CRIM. P. 396, 407-08 (2022). However, a recent national study by the University of Chicago Law School's Federal Criminal Justice Clinic (FCJC) found that judges are not adhering to these two legal requirements and are

giving the presumption greater weight than the law allows. Through courtwatching and qualitative interviews with stakeholders, this study found that the presumption is often treated as a de facto detention order, even though the law makes the presumption easily rebuttable and requires the government to bear-at all times-the "burden of proving that detention is genuinely necessary." *Id*. First, at Step 1, judges are not applying the correct rebuttal standard: "in 95% of presumption cases that held a Detention Hearing in our study, judges either concluded that the arrestee had failed to rebut the presumption or did not mention whether the presumption was rebutted." *ld.* at 161. Second, "data also suggest that judges often disregard Step 2 of the legal test, where they are supposed to weigh the rebutted or unrebutted presumption along with all of the other pretrial release factors in reaching the ultimate release or detention determination." *Id*.

I.      **The Statutory Presumption Of Detention Should Be Viewed With Caution Because It Leads To High Rates Of Detention For Low-Risk Defendants.**

Congress enacted the statutory presumption of detention in the Bail Reform Act of 1984 (BRA) to detain "a small but identifiable group of particularly dangerous defendants." S. REP. NO. 98-225, at 6. Indeed, Congress intended the presumptions to operate primarily on "*major* drug traffickers." S. REP. NO. 98-225, at 20 (emphasis added). Congress emphasized that detention should be presumed only for these major drug traffickers, essentially drug kingpins. S. REP. NO. 98-225, at 7 (emphasizing that it was only for this "limited group of offenders that the courts [needed the] . . . power to deny release pending trial"). "Congress considered at length arrestees' pretrial liberty interests and concluded that the constitutional concerns with pretrial detention required a narrowly tailored statute to secure community safety and appearance in court." *Freedom Denied*, at 73 (citing S. REP. NO. 98-225, at 8-10).

But the presumption of detention has not worked as intended, and federal pretrial detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in

2019. *Pretrial Release and Detention: The Bail Reform Act of 1984*, BUREAU OF JUST. STAT. SPECIAL REP., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); *Judicial Business: Federal Pretrial Services Tables*, ADMIN. OFF. U.S. COURTS ("AO Table"), Table H-14 (Sept. 30, 2019). A recent study by the Administrative Office of the Courts (AO) attributed this "massive increase"[7] in detention rates to the presumption of detention, especially as it is applied to low-risk defendants. *Id.* at 57.

## II.    Case Law Emphasizes Two Checks That The BRA And The Constitution Impose On The Presumption Of Detention

Case law has established two checks that the BRA and the Constitution impose on the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g). *Id*. at 151. In addition, it is impermissible to detain a defendant in a presumption case based solely on evidence of past dangerousness, the nature of the crime charged, or the weight of the evidence.

### A.    Step 1: The Presumption Is Easily Rebutted

Under the law, very little is required for a defendant to rebut the presumption of detention and therefore judges should find the presumption rebutted in most cases. To rebut the presumption, a defendant simply needs to produce "some evidence that he will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707; *see also United States v.*

---

[7] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 FED. PROB. 52, 61 (2017) (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

*Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence."); *United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1-2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)). This "burden of production is not a heavy one to meet." *Dominguez*, 783 F.2d at 707; *see also United States v. Wilks*, 15 F.4th 842, 846-47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g)." *Dominguez*, 783 F.2d at 707 (emphasis added); *Jessup*, 757 F.2d at 384. Any "evidence of economic and social stability" can rebut the presumption. *Dominguez*, 783 F.2d at 707.

## B.    Step 2: The Presumption Alone Is Not Sufficient To Warrant Detention And Must Be Weighed Along With The § 3142(G) Factors

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *See Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

## C.    Forbidden Considerations In A Presumption Case

A judge may not detain a defendant in a presumption case based solely on (1) an

14

unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, or (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion-even if the presumption is unrebutted. It is not incumbent on the defendant to persuade the judge that there exist conditions of release that will reasonably assure the safety of the community. That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846-47 ("[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past[.]" *Dominguez*, 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can prove-by clear and convincing evidence-that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Id.* Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that [attempted enticement of a minor] is not dangerous to the community." *Id*. at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged."

*ld.* This makes sense—a person's likelihood of guilt is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

## ARGUMENT

### I.     The Presumption Of Detention Is Rebutted In This Case

As detailed below, there is more than "some evidence that [Dr. Harchegani] will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707. It is imperative that this Court follow the letter of the law by giving the presumption of detention "the low weight to which it is assigned by case law." *Freedom Denied*, at 146.

Dr. Harchegani has resided in the United States for 11 years during which he has made significant contributions to advancing scientific knowledge. He has maintained a stable residence and was seeking employment at the time of his arrest. Furthermore, his wife resides here and is employed full-time and has been able to sustain both her and Dr. Harchegani. He has no criminal record, no history of nonappearance, and no history of drug or alcohol abuse. And he has abided by the conditions of his state bond to the letter.

The defense has therefore rebutted the presumption in this case.

### II.    Regardless Of The Presumption, Dr. Harchegani Must Be Released Because There Are Conditions That Will Reasonably Assure Appearance And Safety.

Regardless of whether this Court finds that the presumption of detention is rebutted, Dr. Harchegani must be released because there are conditions that will reasonably assure the safety of the community and his appearance in court. The presumption of detention, on its own, is insufficient to justify detention. *Wilks*, 15 F.4th at 847 ("[A]n unrebutted presumption is not, by itself, an adequate reason to order detention."); *Jackson*, 845 F.2d at 1266 (concluding that if the presumption alone could justify detention, "there would be no need for Congress to have

16

specified 'the weight of the evidence against the person' as a separate factor for the court to consider"). The BRA requires courts to weigh all the § 3142(g) factors in every case, even when the presumption has not been rebutted. *Wilks*, 15 F.4th at 847.

A defendant cannot be detained "unless a finding is made that no release conditions 'will reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). And the Court must resolve any doubts regarding propriety of release in favor of Dr. Harchegani. *Herzog v. United States*, 75 S. Ct. 349, 351 (1955).

Here, the government has not carried its high burden of proving by clear and convincing evidence that there are no release conditions that will reasonably assure the safety of the community. *See Dominguez*, 783 F.2d at 708 n.8. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure Dr. Harchegani's appearance in court. Thus, Dr. Harchegani cannot be detained.

Dr. Harchegani is not a flight risk. He has ties to the local community and there is no indication that he has failed to appear for any of his state hearings, or otherwise disobeyed a court order. In fact, the evidence presented by the government shows that he scrupulously abides by court orders. *See* Det. Hr'g. Tr. 30:19-31:02.

Dr. Harchegani is not a danger to the community either. He has no criminal record, no history of violence, or otherwise. In assessing "dangerousness," the applicable standard is not simply whether a person poses a threat or danger, but more appropriately, whether conditions can be imposed to *reasonably* assure safety to the community. The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure his appearance in court and the safety of the community.

17

- Place Dr. Harchegani in the custody of his wife, Nafiseh Faqihi, as a third-party custodian who agrees to assume supervision and to report any violation of a release condition to the court. Mrs. Faqihi has no criminal record, maintains their residence and steady employment, has regularly appeared in court, and was even willing to provide her passport to the Court as well. [§ 3142(c)(1)(B)(i)]

- Place Dr. Harchegani on location monitoring and home incarceration. He would not be allowed to leave his residence except for his desperately needed medical appointments. However, unlike the detention facility, he would not be at risk of imminent harm. [iv]

- Require Dr. Harchegani to participate in computer monitoring. [xiv]

Because there are conditions of release that will reasonably assure Dr. Harchegani's appearance in court and the safety of the community, he must be released.

### III. Statistics Showing That It Is Extraordinarily Rare For Defendants On Bond To Flee Or Recidivate Further Demonstrating That The Foregoing Conditions Of Release Will Reasonably Assure Appearance And Safety.

It is not necessary to detain Dr. Harchegani to meet the primary goals of the BRA, which are to "reasonably assure" appearance in court and community safety. § 3142(e). In this case, this Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2021, 99% of released federal defendants nationwide appeared for court as required and 99% were not arrested for new crimes on bond. AO Table H-15 (Sept. 30, 2022). Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release

rates.[8] Even in districts that release two-thirds of all federal defendants on bond, just 1% fail to

appear in court and 1% are rearrested while released. *Id*. The below chart reflects shows the same

vanishingly low failure to appear and rearrest rates based on AO data spanning 2007 to 2021.



**Figure 4:** Even When Release Rates Increase, Arrestees Almost Never Flee or Recidivate.

In addition, as the federal Probation and Pretrial Services Office recently highlighted,

release rates rose slightly during the pandemic but failure-to-appear and rearrest rates did not

increase. *Freedom Denied*, at 246 n. 42. Release rates increased from 25% in 2019 to 36% in

---

[8] The data showing near-perfect compliance on bond is illustrated in the figure above. *Freedom Denied*, at 25 fig.4.

2021 but "the rates at which people on pretrial release failed to appear in court or were rearrested remained extremely low." *Id*. The bond statistics for this district likewise strongly suggest that Dr. Harchegani should be released. In this district, released federal defendants appeared for court 99% of the time in 2024, and only 1.7% of defendants were rearrested on release. *See* AO Table H-15 (Sept. 30, 2024). Yet despite the statistically low risk of flight and recidivism that defendants like Dr. Harchegani pose, the government recommends detention in 77% of cases nationwide and in 65.6% of cases in this district. *See* AO Table H-3 (Dec. 31, 2024). Clearly the government's detention requests are not tailored to the low risk of flight and recidivism that defendants in this district and elsewhere pose.

Dr. Harchegani must be released because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court or are rearrested on bond. Detaining Dr. Harchegani without such evidence violates his constitutionally protected liberty interest.

**IV.    New Information Exists That Was Not Known To Dr. Harchegani And Has A Material Bearing On The Issue Of Whether There Are Conditions Of Release That Will Reasonably Assure His Appearance And The Safety Of The Community.**

As outlined above, Dr. Harchegani's physical and mental health has rapidly and exponentially deteriorated due to his incarceration at Barnwell. ████████████████ ████████████████████████████████ All of these factors were not known to Dr. Harchegani at the time of his detention hearing and have a material bearing on whether detention is appropriate at all.

**CONCLUSION**

For these reasons, Dr. Harchegani respectfully requests that this Court find that the presumption has been rebutted and release him with conditions.

Respectfully submitted,

s/ *SUHA S. NAJJAR*
Suha S. Najjar
Assistant Federal Public Defender
1901 Assembly Street, Suite 200
Columbia, South Carolina 29201
T: 803-724-6426
F: 803-765-5084
Attorney ID# 13597
Suha_Najjar@fd.org

March 26, 2025
Columbia, South Carolina